IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TERRY LEWIS, an individual,

           Plaintiff,

v.                                    CIVIL ACTION NO. 3:11-0981

AMERICAN ELECTRIC POWER
SYSTEM LONG-TERM DISABILITY
PLAN, et al.,

           Defendants.

**MEMORANDUM OPINION AND ORDER**

        Pending before the Court are cross-motions for summary judgment filed on behalf of Plaintiff Terry Lewis and Defendants American Electric Power Service Corporation Long-Term Disability Plan, an Employee Benefits Plan (hereinafter the Plan) and the Prudential Insurance Company of America (hereinafter Prudential). For the following reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 19) and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 17).

**I.**
**FACTUAL AND PROCEDURAL HISTORY**

        Plaintiff was employed by AEP MEMCO LLC (MEMCO) as a deckhand on a river boat. His job was classified at the heavy physical demand level. On May 17, 2009, Plaintiff first missed work due to illness. On May 27, 2009, Plaintiff was examined by his primary care physician Wesley R. Lieving, DO. Dr. Lieving indicated Plaintiff suffered from hypertension, positional vertigo, and dizziness. Plaintiff was not released to return to work. Over the next two months, Dr. Lieving examined Plaintiff several times. He noted Plaintiff had erratic high blood pressure and

Plaintiff reported suffering headaches, intermittent blurry vision, numbness, burning sensations, chest pain, and low back pain which worsened with prolonged sitting and standing.

Plaintiff returned to work on August 3, 2009. On August 6, 2009, Plaintiff was seen at an Urgent Care in Louisiana complaining of vomiting, abdominal pain, and feeling weak. Matthew Bice, MD, examined Plaintiff and diagnosed him with high blood pressure, diabetes, fatigue, nausea, and weakness. He opined Plaintiff's complaints related to new medications he was taking and returning to a hard labor under hot conditions. Dr. Bice ordered Plaintiff off work until he could follow up with his primary care physician.

Plaintiff was seen by Dr. Lieving on August 10, 2009. Dr. Lieving noted weakness with exertion, fatigue, dizziness, numbness, and high blood pressure on the Certificate of Disability Attending Physician Statement. Dr. Lieving listed Plaintiff's diagnosis as guarded, and scheduled a follow-up appointment.

On August 14, 2009, Plaintiff had an MRI of his brain. The MRI showed periventricular white matter disease. The report listed a differential diagnosis which would include "very early manifestation of chronic small vessel ischemic disease, post inflammatory change or perhaps changes related to vascular medicated migraine headaches." ECF No. 14-3, at 151. The report recommended followup studies for additional characterization.

Plaintiff attended his follow-up appointment with Dr. Lieving on August 25, 2009. Again, Plaintiff complained of numbness, fatigue, and sensitivity to heat. Dr. Lieving ordered a neurological evaluation, and stated Plaintiff should remain off work. On September 29, 2009, Dr. Lieving referred Plaintiff to Robert Lewis, II MD, for a formal neurological evaluation.

On October 13, 2009, Dr. Lewis examined Plaintiff for an evaluation of Plaintiff's complaints of light-headedness. Dr. Lewis opined that he did not believe Plaintiff suffered a stroke or has MS, but he diagnosed him with vertigo, cervical region syndromes, skin sensation disturbance, cerebral atherosclerosis, and diabetes.

During October of 2009, Plaintiff underwent Autonomic Function Testing (a Tilt Table Test) and a CT scan. The CT scan of Plaintiff's head revealed no evidence of acute hemorrhage, aneurysms, or acute intracranial pathology. The CT scan of Plaintiff's neck also showed he had "less than 50% bilateral internal carotid artery stenosis" and the apices of his lungs and thyroid were free of masses. ECF No. 14-4, at 281. However, the Tilt Table Test suggested "orthostatic hypotension based on a significant decrement in blood pressure and a significant increment in heart rate while tilted." *Id.* at 324.

Plaintiff followed up with Dr. Lewis on November 2, 2009. During the visit, Dr. Lewis reiterated his previous assessment of Plaintiff and added orthostatic hypotension based on the Tilt Table Test and benign paroxysmal positional vertigo (BPPV). He said Plaintiff's EMG was normal and there was no evidence of carpal tunnel syndrome or a neuropathy. He recommended

Plaintiff's blood pressure medication be modified and Plaintiff begin physical therapy for his BPPV. Dr. Lewis did not release Plaintiff to return to work.

On November 6, 2009, Plaintiff was seen by John A. Wade, Jr., MD, an ENT. Dr. Wade performed videonystagmography (VNG) testing on Plaintiff. The VNG was normal, and Dr. Wade opined that Plaintiff's dizziness may be caused by orthostatic hypotension. Dr. Wade recommended Plaintiff's primary care physician do a pharmacological review.

By letter dated, November 18, 2009, Plaintiff was awarded long term disability (LTD) benefits effective November 10, 2009. Plaintiff's LTD benefits were based upon Prudential's finding that his disability precluded him from his "own occupation" as defined by the Plan. ECF No. 14-4, at 228. The Plan specifically provided:

> For the initial 24-month period from the date of disability, "disability is defined as an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the material duties of your occupation with AEP.

*Id.* at 227; ECF No. 14-1, at 6.

Dr. Lieving saw Plaintiff in December 2009 and January 2010 for continuing complaints of vertigo and his other symptoms. Dr. Lewis also saw Plaintiff during this time period. Dr. Lewis ordered an MRI which was performed on January 6, 2010. Upon review, Dr. Lewis stated it showed no changes from the previous MRI. Dr. Lewis also noted on his January 6, 2010 report

that Plaintiff had attended 2 to 3 physical therapy appointments for vestibular training, but they did not benefit him. He again recommended modification of his blood pressure medicine.

On February 19, 2010, Plaintiff had a check-up with Dr. Lieving. Dr. Lieving referred Plaintiff to an eye doctor for likely cerebro-vascular disease. On March 9, 2010, Dr. Lieving noted Plaintiff complained of a decrease in energy and feeling tired. Dr. Lieving also stated Plaintiff had continued chronic vertigo, he feels like he is moving, especially when sitting still, and exertion worsens the symptoms with extreme fatigue. Dr. Lieving opined that Plaintiff's symptoms appear to be stable but likely chronic and he stated Plaintiff would not be able to return to his previous work. On April 5, 2010, Dr. Lieving completed a Capacity Questionnaire for Prudential in which he marked that Plaintiff would never be able to work full time or do part-time transitional work.

A representative of Prudential phoned Plaintiff on May 21, 2010. Plaintiff reported to the representative that he gets dizzy and falls when he exerts himself. However, he told the representative that he dug dirt to fill a hole in his yard and carried a five gallon bucket of dirt 25 yards on two occasions. He stopped because his head started to pound. He also said he runs the sweeper, does dishes and laundry, drives to visit his parents, drives a 4 wheeler, cares for his dogs and cats, hunts deer, mows his lawn on a riding mower, watches television, and does some on his computer.

On June 7, 2010, Dr. Lieving again examined Plaintiff. Plaintiff stated he was dizzy for the past week with pounding and throbbing headaches with minimal activity and bilateral numbness in his hands and feet. On July 19, 2010, Dr. Lieving believed Plaintiff may have suffered a stroke. On August 24, 2010, Dr. Lieving noted Plaintiff was suffering from major depression and anxiety after being robbed. On September 22, 2010, Dr. Lieving noted Plaintiff was having visual disturbances at rest and he doubted Plaintiff would be able to return to work in any capacity. In a report dated December 22, 2010, Dr. Lieving stated he needed a neurologist to assist in determining the cause of Plaintiff's problems. He reiterated that he doubted Plaintiff could ever work again because his metabolic issues were under control yet his symptoms have not changed in nearly two years.

In the meantime, on July 9, 2010, Barbara Parke, M.D., conducted a medical disability review on behalf of Prudential and discussed Plaintiff's case with Dr. Lewis. Based upon the information given her, Dr. Parke opined that Plaintiff is limited to lifting 15 pounds occasionally and 10 pounds or less frequently, pushing and pulling 15 pounds occasionally, sitting frequently and standing and walking occasionally, intermittently, and on a self-paced basis that would not include carrying an item over 10 pounds, and never climbing or working at heights. Dr. Parke further stated she believed Plaintiff had an overall capacity to perform sedentary to light capacity work.

An MRI was performed on December 27, 2010. Plaintiff's brain showed no acute abnormailty with nonspecific white matter disease. An MRI of Plaintiff's cervical spine on the same

day showed degenerative changes, with the most prominence at C5/C6 and C6/C7 with some neuroforaminal narrowing and minimal to mild central canal stensosis.

Under the Plan, after 18 months of payments, disability claims are reviewed to determine if a claimant can perform "any occupation." This section of the Plan provides:

> that due to the 1,040-hour elimination period, benefits under the "own occupation" definition of disability can only be paid for a maximum period of 18 months before you would have to satisfy the "any occupation" definition of disability after the 24th month following your date of disability.

ECF No. 14-1, at 7. The Plan further provides the "any occupation" language means that:

> After the first 24 months following the date of disability, "disability" is defined as an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the duties of any occupation for which you are reasonably qualified by your education, training and experience. So long as you continue to meet the requirements of this "two-year test," you will continue to be considered disabled.

*Id.* On January 7, 2011, Prudential contacted Plaintiff and informed him that his benefits would be terminated effective May 17, 2011,[1] because he was not disabled under the "any occupation" language in the policy. Prudential stated it had referred Plaintiff's file to a Vocational Consultant and listed restrictions of lifting no more than 15 pounds occasionally and no more than 10 pounds frequently; pushing or pulling 15 pounds occasionally; avoiding climbing or working at heights; no more than occasionally standing and walking, on an intermittent, self-paced capacity that would not

---

[1] May 17, 2011 is the end of the eighteen-month time period.

-7-

involve carrying an item more than 10 pounds; and limited to sitting frequently. Based upon these restrictions, Prudential found Plaintiff could work as a Gate Guard (light job category), Telemarketer (sedentary job category), or Surveillance Systems Monitor (sedentary job category).

On February 2, 2011, Plaintiff had a check-up with Dr. Lieving. In his summary, Dr. Lieving wrote "given the extent of time without change I do NOT feel his condition will ever improve and he will not be able to work under any capacity ever again[.]" ECF No. 14-8, at 568. Dr. Lieving followed up his report with a letter supporting Plaintiff's appeal of Prudential's decision by stating that in his professional opinion Plaintiff "can no longer work in ANY occupation." ECF No. 14-7, at 457 (emphasis original). In support of his opinion, Dr. Lieving wrote:

> For nearly two years he has suffered from daily symptoms of vertigo and visual disturbances with resultant ataxia and impaired quality of life. These symptoms began after a vascular event while working on the river and associated with uncontrolled hypertension. Despite adequate control of his metabolic issues and blood pressure and an extensive workup and treatment plan from cardiology, nephrology, ophthamology, and neurology; including a second opinion, his symptoms and disability have NOT changed. His story has remained consistent and he has been 100% compliant with every test and office visit. This issue is in no way related to pain or pain medication. This illness has robbed him of his livelihood and his hobbies and has strained his family relationships.
>
> The most compelling medical evidence to support his claim is his abnormal MRI scan of his brain showing extensive white matter disease particularly in the brainstem. The etiology of these abnormalities was uncontrolled hypertension and undiagnosed diabetes.

*Id.* (emphasis original). Dr. Lieving also completed a Residual Functional Capacity Assessment dated February 17, 2011, in which he opined Plaintiff cannot lift or carry any additional weight, can stand or walk less than 2 hours per regular workday, can sit less than 2 hours per regular workday, cannot push or pull to operate hand and/or foot controls, can work less than a full range of sedentary work, and cannot climb, balance, stoop, kneel, crouch, crawl, reach, grasp, perform fine manipulation, feel, or see. He further opined Plaintiff could not work at temperature extremes or heights or work on tasks requiring an ability to concentrate or remember, or which involves moving machinery. Dr. Lieving based his opinion on a diagnosis of a severe stroke, severe vertigo, severe visual disturbance, severe high blood pressure, and mild mytonic dystorphy type 2. Dr. Lieving noted that Plaintiff has daily and frequent episodes of vertigo and visual disturbances which are secondary to a stroke.

By letter dated March 8, 2011, Prudential rejected Dr. Lieving's opinion. Prudential stated Dr.Lieving's opinion was not supported by medical data, and Prudential reiterated that Plaintiff could perform other work with certain limitations and restrictions.

Plaintiff appealed Prudential's decision. Prudential sent Plaintiff's medical records for external review to Robert L. Broghammer, M.D., who is board certified in preventive and occupational medicine. Based upon his review of the file, Dr. Broghammer opined that Plaintiff is restricted from "heavy lifting, carrying, pushing and pulling (over 40 pounds), no working at heights, and avoiding sudden changes in posture." ECF No. 14-9, at 655. However, Dr. Broghammer said "[t]here would be no restrictions for sitting, standing, walking and performing

upper extremity activities on a full time sustained basis." *Id*. Dr. Broghammer found the only positive finding upon examination was the Tilt Table Test. Therefore, Dr. Borghammer stated that Dr. Lieving's opinion was not supported. Dr. Borghammer also noted:

> The claimant's three brain MRI's [sic] are all stable and point to chronic small vessel ischemia. His lab data are unremarkable. His CTA of the head and neck showed clinically insignificant internal carotid narrowing. On 11/02/2009, Dr. Lewis noted no evidence of MULTIPLE SCLEROSIS or stroke and the claimant's Hal-pike maneuver was not positive. On 11/17/2009, Dr. Wade noted claimant's VNG showed no evidence of central or peripheral neurological lesion. On 02/26/2010, the Holter monitor was negative. Also, the claimant reports on 01/11/2010 that he hunts, which is an activity that suggests the ability to work within restrictions and limitations noted above. This activity is inconsistent with the ability to work within the restrictions and limitations noted above. This activity is inconsistent with the claimant's stated abilities per his treating doctors.

*Id.* at 656.

On October 7, 2011, Steve Lambert, a Vocational Rehabilitation Specialist, reviewed the Employability Assessment completed on September 3, 2010, to determine if there were alternative occupations Plaintiff could perform. Mr. Lambert noted Plaintiff had no formal education beyond a high school diploma and had no restrictions for sitting, standing, walking, and performing upper extremity activities on a full time sustained basis. However, he recognized Plaintiff was restricted from lifting, carrying, pushing, pulling more than 40 pounds, not working at heights, and avoiding sudden posture changes. Based upon a transferable skills analysis, Mr.

Lambert opined Plaintiff could work as a product assembler, bench assembler, vending machine attendant, gate guard, telemarketer, or surveillance system monitor.

On October 11, 2011, Prudential upheld its earlier decision to terminate Plaintiff's LTD benefits. The decision reviewed Plaintiff's medical history and found that the only positive clinical finding was the Tilt Table Test, which warranted the restrictions noted by the vocational consultant. Although the decision acknowledged Plaintiff could not return to his previous job as a deckhand, Prudential found he could perform the other employment identified by the Vocational Consultant given his restrictions, limitations, work experience, training, and education. Therefore, Prudential determined Plaintiff did not meet the requirements of the "any occupation" language in the Plan.

Plaintiff then filed this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, appealing the decision In his Complaint, he alleges he was wrongfully denied LTD benefits under the Plan. Defendants assert the claim is without merit.

## II.
## STANDARD OF REVIEW

Under ERISA, courts must conduct a *de novo* review of an administrator's decision to deny benefits, unless the plan confers discretionary authority upon the administrator "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When discretion is vested with an administrator, courts must review the decision for an abuse of discretion. *Id*; *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315 (4th Cir. 2001) (citation omitted). In applying the abuse of discretion standard, an administrator's

decision, "will not be disturbed if it is reasonable, even if . . . [the] court would have come to a different conclusion independently." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (citations omitted).[2] If the decision is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence[,]" the decision must be affirmed, and the reviewing court cannot substitute its own judgment for that of the administrator. *Elliot v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999) (internal quotation marks omitted). It is the claimant's burden to demonstrate entitlement to benefits. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270 (4th Cir. 2002) (providing that it is the claimant's burden of proving disability).

In this case, Plaintiff argues that there is a conflict of interest which should be considered in deciding whether there has been an abuse of discretion. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). When a conflict of interest exists, it "becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion." *Carden v. Aetna Life Ins. Co.,* 559 F.3d 256, 260 (4th Cir. 2009) (quoting *Glenn*, 128 S. Ct. at 2351). How much weight to give the conflict "will . . . depend largely on the plan's language and on consideration of other relevant factors." *Id*. at 261.

Plaintiff argues that the language of the Plan at issue in this case names Prudential as the Plan's claim administrator, but AEP also "retain[s] the authority, responsibility and discretion to determine eligibility to participate in the LTD Plan and has appointed the AEP Recovery Center

---

[2]*Abrogated on other grounds*, *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010).

to make initial determinations of eligibility and an internal LTD Appeals Committee to consider appeals of adverse eligibility determinations made by the AEP Recovery Center." *AEP Long-Term Disability Plan*, *Summary Plan Description for Active Employees, Issued 2010,* ECF No. 14-1, at 13. Plaintiff asserts that this retention of authority by AEP creates a conflict of interest.

However, as noted by Defendants, determinations of eligibility to participate in the Plan are much different than determinations of benefits. The Plan very clearly gives Prudential full authority to determine whether benefits should be awarded, providing in part: "Prudential has full discretion and authority to determine eligibility for benefits and for continued benefits and both have full discretion and authority to construe and interpret all terms and provisions of the plan." *Id.* at 16. In this case, Plaintiff's *eligibility* to participate in the Plan is not at issue. Therefore, the Court finds no inherent conflict of interest as to Prudential making a benefit decision merely because AEP has retained authority to make a decision on an unrelated matter under the Plan. Likewise, the Court finds no conflict of interest merely because AEP pays Prudential to serve as the claims administrator. *See Lovejoy v. American Elec. Power Long-Term Disability Plan*, Civ. Act. No. 2:10-01386, 2012 WL 383661, at *8-9 (S.D. W. Va. Feb. 3, 2012) (Goodwin, J.) (rejecting the claimant's argument that the fact AEP could terminate the claim administrator created a conflict of interest); *Conley v. Cingular Wireless Employee Health & Benefits Plan*, Civ. Act. No. 3:09-0327, 2010 WL 3491233, at *6 (S.D. W. Va. Sept. 1, 2010) (Chambers, J.) (finding "[a] significant conflict of interest is not established merely because . . . [a third party administrator] is paid for its service"); *Roberts v. American Elec. Power Long-Term Disability Plan*, No. 3:07-0593, 2010 WL 2854299, *8 (S.D. W. Va. July 19, 2010) (Chambers, J.) (rejecting the claimant's argument that the

administrator "is conflicted as a result of the fact that it participates in a competitive market and receives compensation for its services.  As this must be the situation for nearly every independent claims administrator, the Court cannot conclude that Aetna's role creates a significant degree of conflict").

In *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), the Fourth Circuit set forth a nonexclusive list of "other relevant factors" courts should consider in determining the reasonableness of an administrator's decision.  These include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43 (footnote omitted).  The Court applies these factors as guidance in considering the present case but, for the reasons stated above, places no greater emphasis on the conflict of interest factor.

### III.
### DISCUSSION

Here, Plaintiff has presented evidence from Dr. Lieving, his treating physician, in support of his disability claim.  Dr. Lieving unequivocally has opined that Plaintiff can no longer work in any occupation.  However, Dr. Broghammer conducted an external review and found that

the restrictions opined by Dr. Lieving were not supported by medical evidence. Dr. Broghammer further opined that Plaintiff was not restricted from "sitting, standing, walking and performing upper extremity activities on a full-time sustained basis," but that he would be restricted from "heavy lifting, carrying, pushing and pulling, (over 40 pounds), no working at heights, and avoiding sudden changes in posture." ECF No. 14-9, at 655. In addition, Dr. Parke reviewed Plaintiff's medical records, spoke with Dr. Lewis, and opined that Plaintiff had the residual functional capacity to work in the light to sedentary range. The Vocational Rehabilitation Specialist also considered the limitations listed by Dr. Broghammer and opined that Plaintiff could perform several jobs based upon a transferable skills analysis.

It is clear in reviewing the records that Plaintiff has medical issues which prevent him from working as a deckhand. However, the medical evidence conflicts as to whether he can perform "any occupation" as defined by the Plan. In fact, Plaintiff's own account of his daily activities conflicts with the Residual Functional Capacity Assessment completed by Dr. Lieving. Although Plaintiff urges this Court to adopt the opinion of Dr. Lieving, it is well established that plan administrators are not required to give special deference to the opinions of a claimant's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003). Thus, this Court cannot reverse the Plan's decision under the abuse of discretion standard merely because Plaintiff's treating physician believes he qualifies for LTD benefits. Here, the reviewing physicians found insufficient evidence to support that conclusion, and the Court cannot reverse based upon the record before it.

In his motion, Plaintiff further asks that, if this Court does not award benefits, then it remand this case back to Prudential with directions it conduct an independent medical examination (IME). In support, Plaintiff cites *Payzant v. Unum Life Insurance Company of America*, 402 F. Supp.2d 1053, 1062 (8th Cir. 2005), in which the Eighth Circuit found the failure of the insurer to conduct an IME or functional capacity evaluation (FCE) was a procedural irregularity under the facts presented. However, *Payzant* is distinguishable from the present case,[3] and Plaintiff has not cited any other basis upon which remand in this case is appropriate. Therefore, the Court denies his request for remand.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court the Court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 19) and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 17).

---

[3]In *Payzant*, the plaintiff suffered from fibromyalgia and was denied LTD benefits. 402 F.Supp.2d at 1059. The plaintiff's two primary doctors believed the plaintiff should have a functional capacity evaluation (FCE) to determine the extent of her disability, given the subjective nature of fibromyalgia, which it considered an "uncommon disease." *Id*. at 1062. The insurer also failed to speak with one of the plaintiff's treating physicians, despite his eagerness to tell the insurer why he believed the plaintiff could not work. Thus, given the uncommon nature of the plaintiff's ailment and the fact that both treating physicians requested an FCE and the insurer performed neither an FCE nor an IME, the Eighth Circuit determined it resulted in a procedural irregularity. *Id*. In addition, the Eighth Circuit found it was a procedural irregularity for the insurer to require objective evidence of fibromyalgia, when the medical profession considers it a subjective disease, and there was no contrary or inconsistent evidence to the plaintiff's complaints in the record. *Id*. at 1064. Using a less deferential, sliding scale standard of review, the Eighth Circuit overturned the insurer's decision. *Id*. at 1065.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: January 29, 2013

*[signature]*
ROBERT C. CHAMBERS, CHIEF JUDGE